# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

In re: CCA Recordings 2255 Litigation,
                                    **Petitioners,**

**v.**                                          **Case No. 19-cv-2491-JAR-JPO**

                                    **(This Document Relates to Case No. 15-cr-20086-DDC-1, *United States v. Martez Blakney*, and Case No. 18-2454-JAR-JPO, *Martez Blakney v. United States*)**

**United States of America.**
                        **Respondent.**

---

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Martez Blakney's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. No. 35).[1]  Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship by becoming privy to his attorney-client communications, and asks the Court to reject the government's request to dismiss this action on procedural grounds and find that he has made a sufficient showing to warrant an evidentiary hearing.  As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, to reduce his custodial sentence by 50% and vacate his term of supervised release.[2]  The government has

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 15-20086-1-DDC.  Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] Petitioner completed his custodial sentence on November 18, 2020, and withdraws his request to reduce his term of imprisonment.

responded, opposing the motion and seeking dismissal on several grounds, including on threshold jurisdictional grounds.[3]  The Court held that because the alleged Sixth Amendment violation occurred after Petitioner entered his guilty plea but before he was sentenced, he lacked standing to challenge his conviction, but not his sentence.[4]  The Court has reviewed the parties' submissions and the record and is prepared to rule.  For the reasons explained in detail below, the Court denies the government's request to dismiss on timeliness grounds.  Petitioner's challenge to his sentence, including any term of supervised release, is denied.  Petitioner is also denied a certificate of appealability.

## I.    Background

### A.    Procedural History

Petitioner was charged in an indictment with possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[5]

On April 11, 2016, Petitioner pleaded guilty to the offense pursuant to a written binding plea agreement with the government pursuant to Fed. R. Crim. P. 11(c)(1)(C).[6]  In exchange for Petitioner's guilty plea, the government agreed to: (1) recommend a sentence between 57 and 71 months' imprisonment; and (2) not file additional charges arising out of the facts forming the basis for the indictment.[7]  The plea agreement stated that "if the Court does not agree with the sentence, the parties may be restored to the positions they maintained prior to reaching this plea agreement."[8]  While the plea agreement included an appeal and collateral attack waiver, it

---

[3] *Blakney v. United States*, No. 18-2454-JAR-JPO, Docs. 2, 5, 7.

[4] *CCA Rec. Lit.*, Docs. 730, 784.

[5] Doc. 1.

[6] Doc. 23.

[7] *Id.* ¶¶ 3, 5.

[8] *Id.* ¶ 3.

specifically reserved Petitioner's right to collaterally attack his conviction and sentence based on ineffective assistance of counsel and prosecutorial misconduct.[9]

Based on a total offense level of 19 and a criminal history category of VI, the Presentence Investigation Report ("PSR") calculated Petitioners' Guidelines range at 63 to 78 months.[10]  The government did not file any objections to the PSR or a sentencing memorandum prior to the sentencing hearing.  On August 1, 2016, Judge Carlos Murguia adopted the PSR's sentencing calculations and found that the Guidelines range was 63 to 78 months' imprisonment.[11] Petitioner requested a sentence of 57 months, while the government argued for a sentence at the top of the plea agreement range, 71 months.[12]  The Court sentenced Petitioner to a sentence that fell both within the advisory Guidelines range and the range included in the plea agreement, sentencing Petitioner to a total term of 64 months' imprisonment, followed by a three-year term of supervised release.[13]  Petitioner did not file a direct appeal, nor has he filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented by Thomas Bartee in the underlying criminal proceedings. The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[14]  On August 29, 2018, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship. Petitioner was released under the terms of supervised release on November 18, 2020.  On

---

[9] *Id.* ¶ 10.

[10] Doc. 26 ¶ 118.

[11] Sent. Hrg. Tr., Doc. 38 at 6.

[12] *Id.* at 8, 10.

[13] *Id.* at 18–19.

[14] Standing Order 18-3.

October 1, 2021, Judge Daniel Crabtree[15] revoked Petitioner's term of supervised release and sentenced him to a custodial term of one year and a day, followed by a one-year term of supervised release.[16]  His new release date is June 27, 2022.[17]

### B.   The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motion before the Court.[18]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information

---

[15] Following Judge Murguia's resignation, the underlying criminal case was reassigned to Judge Crabtree. Doc. 54.

[16] Doc. 70.

[17] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Dec. 20, 2021).

[18] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

they claimed to have gleaned from the video recordings.[19]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[20]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[21] (2) the video and audio recordings in USAO custody to be impounded;[22] and (3) the government to preserve its computer hard drives.[23]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[24]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[25]  The Special Master determined that the government had obtained from CCA video recordings of the attorney-meeting rooms made between February 20, 2016, and May 16, 2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700 attorney visits.[26]  This Court in *Black* found that the USAO did not come into possession of the

---

[19] *Id.* at 70–80.

[20] *Id.* at 29–30.

[21] *Black*, Doc. 253 at 3.

[22] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[23] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[24] *Black*, Doc. 146 (Appointment Order).

[25] *Black*, Doc. 193.

[26] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

CCA videos until June 1, 2016.[27]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[28]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[29]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[30]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[31]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's

---

[27] *Black* Order at 66.

[28] *CCA Rec. Lit.*, Doc. 784 at 13.

[29] *CCA Rec. Lit.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[30] *Black* Order at 164–65.

[31] *Id.* at 145–62.

decision in *Shillinger v. Haworth*,[32] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[33]  Once those elements are established, prejudice is presumed.[34]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[35]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD in each individual case: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[36]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[37]

---

[32] 70 F.3d 1132 (10th Cir. 1995).

[33] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[34] *Id.*

[35] *Id.* at 163.

[36] *Id.* at 166.

[37] *Id.*

C.      **Proceedings in Consolidated Master Case**

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[38]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[39]  The government raised blanket objections to the privilege logs, arguing that many fail to meet the threshold showings because (1) they do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not sufficient to establish privileged attorney-client communications are depicted on a soundless video.

---

[38] *CCA Rec. Lit.*, Doc. 1.

[39] *CCA Rec. Lit.*, Doc. 21 at 50.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[40]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[41]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[42]  Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their

---

[40] *CCA Rec. Lit.*, Docs. 587, 588.

[41] *Id.*  The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings.  *CCA Rec. Lit.*, Doc. 926.

[42] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.   Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[43]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[44]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[45]

Petitioner timely filed his Rule 2(b) certification on March 29, 2021.[46]

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[47]

### D.   Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of

---

[43] *Id.*  (citing 411 U.S. 258 (1973)).

[44] *CCA Rec. Lit.*, Docs. 874, 922.

[45] *CCA Rec. Lit.*, Docs. 730, 784.

[46] *CCA Rec. Lit.*, Doc. 813-1.

[47] *CCA Rec. Lit.*, Doc. 1034.

the *Black* investigation.[48]  The FPD, along with defense counsel Thomas Bartee, reviewed two video recordings of Petitioner meeting with Mr. Bartee in person at CCA on April 8 and 26, 2016.[49]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these meetings, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Bartee.[50]  Petitioner also provided a sworn declaration from Bartee, stating that he reviewed the video recordings listed on the privilege log that occurred on April 8 and 26, 2016, and confirmed, with respect to the recorded meetings and each other meeting with Petitioner at CCA: (1) the only reason he met with Petitioner "was to discuss matters related to legal advice or strategy"; and (2) he had no knowledge nor did he believe that the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[51]

Petitioner was prosecuted by AUSA Terra Morehead, who denies that she viewed the recordings during the pending underlying case.[52]

The Court reviewed the video recording *in camera*. As set out in the privilege log, the Court confirms that the first video recording shows Petitioner meeting with someone Bartee identifies as his investigator on April 8, 2016 for approximately two hours and thirty-three minutes, where they reviewed documents.  The second recording, dated April 26, 2016, shows Petitioner meeting with Mr. Bartee for two hours and twenty-eight minutes, during which time

---

[48] *Black* Order at 165.

[49] *CCA Rec. Lit.*, Doc. 205-2 at 15–16.

[50] *Id.*

[51] *Blakney*, 18-2454-JAR-JPO, Doc. 4-1.

[52] *Id.*, Doc. 3-1.

they reviewed documents.  In light of the analysis below, however, further details of the meeting

visible in the video are not pertinent and will not be discussed in this order.

## II.    Discussion

### A.    Timeliness

The government moves to dismiss Petitioner's § 2255 motion as untimely.  "Section

2255(f) establishes a one-year limitations period for filing a § 2255 motion.  The limitations

period commences on the latest of four dates."[53]  Petitioner relies upon subsection

§ 2255(f)(4), "the date on which the facts supporting the claim or claims presented could have

been discovered through the exercise of due diligence."  This subsection "is an example of what

are called 'discovery rules' for delaying the accrual of a cause of action."[54]  The Tenth Circuit

has explained that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") rule

differs from most discovery rules in one respect: "[t]he typical provision starts the limitations

period either (1) when the plaintiff has actually discovered the pertinent facts or (2) when a

person exercising reasonable diligence would have discovered those facts.  The AEDPA

provision contains only the second test, an objective standard."[55]  "The exercise of reasonable

diligence is an ongoing process.  What is required at any particular time depends on what one has

notice of at that time."[56]  "It is irrelevant whether that information has come to the defendant's

attention by serendipity or diligence."[57]  "The question is whether the defendant acted with

---

[53] *United States v. Denny*, 694 F.3d 1185, 1188 (10th Cir. 2012).

[54] *Id.* at 1189.

[55] *Id.* (citations omitted)

[56] *Id.* at 1190.

[57] *Id.*

reasonable diligence after the information was acquired.  And once the defendant could have discovered the pertinent facts, the § 2255 motion must be filed within one year."[58]

In this case, Petitioner filed his § 2255 motion on August 29, 2018.  His motion is therefore timely under § 2254(f)(4) unless "the facts supporting" his intentional-intrusion claim "could have been discovered through the exercise of due diligence" on or before August 28, 2017.[59]  The government contends that because the Special Master issued his first report regarding video recordings on January 31, 2017, Petitioner could necessarily have discovered the factual predicate for his claim at that point and he would have had one year from that date to raise his Sixth Amendment claim to be considered timely under § 2255(f)(4).  In this report, the Special Master: (1) selected thirty random entries from CCA's visitation calendar; (2) "examined the video recordings to determine if these attorney visits with an inmate were recorded"; (3) verified that each of those thirty meetings "was, in fact, recorded"; and (4) distributed CCA's visitation logs and attorney sign-in sheets "to the parties[]."[60]  The government does not state when the Special Master distributed the sign-in sheets to the parties.  The FPD states that according to its records, the Special Master did not release these materials until June 19, 2018.  Petitioner also notes that he did not become a "party" to this litigation until the Court issued its Standing Order 18-3 on July 17, 2018.

In support of its untimeliness argument, the government cites *Johnson v. United States*, where the issue before the Supreme Court was whether a state-court order that vacates a

---

[58] *Id.* (footnote omitted).

[59] 28 U.S.C. § 2254(f)(4); *see United States v. Hurst*, 322 F.3d 1256, 1260–62 (10th Cir. 2003) (explaining that "the day of the act" that triggers the clock is not included in the § 2255(f) calculation; holding that "the one-year period of limitations applicable to [petitioner's] § 2255 motion commenced" the day following the date his conviction becomes final (quoting Fed. R. Civ. P. 6(a))).

[60] Doc. 217 at 8 (quotations omitted).

petitioner's prior state court conviction at the petitioner's request constitutes a "fact"—as opposed to a legal proposition—for purposes of § 2254(f)(4).[61]  The Court addressed "the question of how to implement the statutory mandate that a petitioner act with due diligence in discovering the crucial fact of the vacatur order that he himself seeks," concluding that any due diligence is shown by prompt action by the petitioner in seeking the state vacatur order,"[62] an event within the petitioner's control.  Thus, the Court held that an order vacating a petitioner's state conviction is a fact for purposes of § 2255(f)(4), but the one-year "period begins when a petitioner receives notice of the order vacating the prior conviction, provided that he has sought it with due diligence in state court."[63]

By contrast, the Court agrees that Petitioner had no such element of control over when or if the facts that form the basis of his Sixth Amendment claim occurred.  Instead, he must show that "a person exercising reasonable diligence would [not] have discovered" the facts supporting his claim more than one year before that claim was filed.[64]  Here, it is not apparent that Petitioner would or even could have discovered the facts needed to support his video recording claim within one year after the Special Master issue his first report, which was issued prior to the October 2018 evidentiary hearing and more than two years before the Court released the impounded videos to the FPD in August 2019.  The Court agrees that the government's possession of the videos would not have been sufficient, in and of itself, to prove a per se Sixth Amendment claim under *Shillinger*.  Even assuming that Petitioner had some reason to suspect the government had not only possessed the recording of his attorney-client meeting but also

---

[61] 544 U.S. 295, 301–02 (2005).

[62] *Id.* at 308–09.

[63] *Id.* at 298.

[64] *United States v. Denny*, 694 F.3d 1185, 1189 (10th Cir. 2012).

became privy to it, this suspicion would have been insufficient to trigger any obligation to assert a Sixth Amendment claim. Instead, "due in large part to the government's strategy of delay, denial, and deflection in the *Black* case and its handling of attorney-client recordings,"[65] it was not until at least the October 2018 evidentiary hearing that evidence supporting the privy-to element of Petitioner's claim came to light. Because Petitioner filed his § 2255 prior to the October 2018 evidentiary hearings, his § 2255 motion is timely.

### B.      Decision in Consolidated Proceedings

The Court entered a Memorandum and Order on December 10, 2021, that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule, which is incorporated by reference herein.[66]

As discussed in detail in that Order, the Tenth Circuit has recognized that a per se *Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error where the government's unjustified purposeful intrusion into a defendant's attorney-client relationship precludes application of the harmless-error standard and requires automatic relief.[67] The Court went on to conclude, however, that the categorical extension of *Shillinger*'s per se rule to violations that occurred post-plea or conviction but prior to sentencing would amount to an overapplication of that ruling beyond the rationale contemplated and described by the Tenth Circuit.[68] Accordingly, the Court declined to extend *Shillinger*'s per se rule to an alleged pre-

---

[65] *United States v. Phommaseng*, No. 15-20020-JAR, 2019 WL 3801720, at *8 (D. Kan. Aug. 13, 2019) (ruling that "[t]he existence and scope of potential Sixth Amendment claims was not certain until January 2019 for [the petitioner's] audio recordings claim" because it was not until then that the government admitted to obtaining the petitioner's recorded attorney-client calls).

[66] *CCA Rec. Lit.*, Doc. 1034.

[67] *Id.* at 14.

[68] *Id.* at 20–21.

sentence Sixth Amendment violation and prejudice is not to be presumed in this category of claims.[69]  Instead, petitioners must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[70]

### C.    Application

Petitioner's claim is in the temporal category of motions alleging post-plea/pre-sentencing Sixth Amendment violations.  Petitioner falls in a sub-category of these claims involving a Rule 11(c)(1)(C) binding plea agreement for a recommended sentencing range.  The recorded meetings between Petitioner and Bartee took place on April 8 and 26, 2016, before and after he entered a binding unconditional guilty plea on April 11, 2016, and before he was sentenced on August 1, 2016.  As noted above, however, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner's plea but before he was sentenced.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner entered a guilty plea, it eliminates the possibility that the intrusion could have tainted the petitioner's conviction.[71]  Thus, Petitioner does not have standing to challenge his guilty plea under § 2255.[72]  The only tainted proceeding could be sentencing.  Having determined this category of governmental-intrusion claims may not rely on the *Shillinger* presumption of prejudice, the Court turns to whether Petitioner has demonstrated a realistic possibility of injury or benefit to the government.  Even assuming Petitioner has satisfied the

---

[69] *Id.* at 21.

[70] *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[71] Doc. 730 at 54.

[72] *Id.*

other elements of his Sixth Amendment claim, Petitioner cannot show any realistic possibility that he was prejudiced as a result of the government's alleged intrusion.

Petitioner entered into a binding Rule 11(c)(1)(C) plea agreement and was sentenced consistent with that agreement. The government's discretion or capacity to prejudice the defendant was curtailed by the specific terms of the plea agreement. The government did not raise any objections to the PSR or file any other motions regarding Petitioner's sentencing, and the 64-month sentence included in the binding plea agreement was within the agreed-upon range of 57 to 71 months contemplated by the plea agreement and below the 71-month sentence recommended by the government. The only governmental conduct that had any effect on sentencing was its offer of a binding plea agreement with a sentencing range that resulted in a sentence at the low end of the advisory Guidelines range. Petitioner has not demonstrated, nor can the Court imagine, any realistic possibility of prejudice under these circumstances.

Because Petitioner has not shown and cannot show a realistic possibility of prejudice as a result of the government's alleged intrusion into his attorney-client relationship, and nothing in the record suggests any threat to the reliability or fairness of Petitioner's sentencing proceedings, he cannot succeed on his Sixth Amendment claim. Petitioner's § 2255 motion is denied.

## III.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[73] To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the

---

[73] 28 U.S.C. § 2253(c)(2).

constitutional claims debatable or wrong."[74]  For the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Martez Blakney's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 35) is **denied** without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: <u>December 20, 2021</u>

                          S/ Julie A. Robinson
                          JULIE A. ROBINSON
                          UNITED STATES DISTRICT JUDGE

---

[74] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).